# UNITED STATES DISTRICT COURT

### for the

### District of Southern California

FILED

JUN 0 5 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One Verbatim Thumb Drive,<br>S/N: NG04G4315006262DML | )<br>)<br>)<br>)<br>)<br>)    Case No. |

18MJ3041

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
As further described in Attachment A-2.

located in the    San Diego, California    District of    Southern California   , there is now concealed *(identify the person or describe the property to be seized):*
As set forth in Attachment B-2.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 8 U.S.C. § 1324 | Transporting Certain Aliens |

The application is based on these facts:

The Affidavit of United States Border Patrol Agent Matthew Smith is incorporated herein by reference.

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Smith, United States Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    6/5/2018

_____
*Judge's signature*

City and state:    San Diego, California      Honorable Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2:

### *DESCRIPTION OF DEVICE TO BE SEARCHED*

One Verbatim Thumb Drive, S/N: NG04G4315006262DML
("Subject Thumb Drive");

The device was seized on or about April 24, 2018 from Mambasse Koulabalo PATARA, in the Southern District of California, and is currently in the custody of U.S. Border Patrol, located at 3752 Beyer Blvd., Bldg. 24, San Diego, CA 92173.

## ATTACHMENT B-2

## ITEMS TO BE SEIZED

The items to be seized are evidence of transportation of illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). These crimes relate to the smuggling of aliens (namely aliens Fermin LOPEZ and German RAMIREZ-Gonzalez) in and around the County of San Diego, California by Mambasse Koulabalo PATARA, and other known and unknown co-conspirators for the period from on or about April 16, 2018 through April 24, 2018, whereby the criminal conduct involves the aliens being transported further into United States once the aliens entered the United States from the Republic of Mexico. The evidence to be seized is limited to the time period of April 16, 2018 to April 24, 2018 and is limited to electronic communications, correspondence, photographs, audio files, videos, or location data stored documents pertaining to the following:

a.  tending to indicate that the user of the electronic device benefits, financially or by receiving anything of value, from the alien smuggling;

b.  tending to show telephone numbers and direct connect numbers or identities assigned to the device, including usernames and passwords and electronic mail addresses;

c.  tending to show call and direct connect history information, including Internet Protocol addresses accessed by the device or accessing the device;

d.  tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, telephone numbers that may contain electronic evidence tending to show efforts to recruit, harbor, transport, provide, obtain or maintain a person involved in alien smuggling; or tending to indicate efforts to recruit, harbor, transport, provide, obtain or smuggle a person; or tending to indicate that the user of the electronic device benefits, financially or by receiving anything of value, from alien smuggling;

1

e.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling;

f.  tending to identity the user of, or persons with control over or access to, the electronic device;

g.  Stored photographs, videos and text messages tending to show planning of and involvement in alien smuggling;

h.  Stored electronic mail, including attachments, and voice messages and other recordings tending to show planning of and involvement in alien smuggling;

i.  Web-browsing history and any stored web pages tending to show planning of and involvement in alien smuggling;

j.  Stored documents and other files tending to show planning of and involvement in alien smuggling, and planning and involvement in the payment of alien smuggling fees;

k.  Stored geo-location information tending to show planning of and involvement in alien smuggling; and,

l.  Data stored in any application tending to show planning of, and involvement in, and paying or receiving payments for alien smuggling.

Authorization is sought to search for and seize evidence of the crimes described above in paragraphs 1 and 2. Authorization to search includes the premise and property as described more fully in **Attachment A-2**.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF:<br><br>One ZTE Cellular Telephone, IMEI: 99000142339221 S/N: 321230301811<br><br>One Verbatim Thumb Drive, S/N: NG04G4315006262DML | Case No.:<br><br>**18MJ3041**<br><br>**AFFIDAVIT OF UNITED STATES BORDER PATROL AGENT MATTHEW SMITH IN SUPPORT OF SEARCH WARRANT** |

## **AFFIDAVIT**

I, MATTHEW SMITH, United States Border Patrol Agent - Intelligence ("USBPA-I"), having been duly sworn, depose and state as follows:

### **INTRODUCTION**

1.     On May 15, 2018, the Honorable Karen S. Crawford signed five search warrants authorizing the search of five cellular telephones seized as part of arrests connected to an alien smuggling event on April 24, 2018.

2.     After Judge Crawford signed the warrants, I learned that an additional cellular telephone and one thumb drive were found among items that had been designated as the personal property of defendant Mambasse Koulabalo PATARA. After discovery of the additional cellular telephone and thumb drive, these items were seized as evidence. I believe the cellular telephone and thumb drive are evidence of a crime and seek authority to search these items as further described below. The search warrant signed by Judge Crawford on May 15, 2018 for PATARA's other seized cellular telephone is incorporated herein by reference and is attached as Appendix A.[1]

---

[1]     On May 28, 2018, after four out of the five cellular telephones had been searched and data extracted, I learned that three out of the five cellular telephones that were subject of the May 15, 2018 search warrant had initially been searched by United States Border Patrol Agents on

1

3.     I make this affidavit in support of an application for a search warrant for one ZTE cellular telephone, IMEI 99000142339221, S/N 321230301811, seized from defendant Mambasse Koulabalo PATARA (**Subject Telephone**); and one Verbatim Thumb Drive, S/N NG04G4315006262DML, seized from defendant Mambasse Koulabalo PATARA (**Subject Thumb Drive**), (hereinafter collectively referred to as the "**Subject Devices**").  The **Subject Devices** were seized on or about April 24, 2018, at the time of PATARA's arrest in connection with a smuggling event within the Southern District of California in which defendant PATARA was arrested for transportation of unlawful aliens, specifically German RAMIREZ-Gonzalez ("Ramirez") and Fermin LOPEZ ("Lopez"), in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).[2]  The **Subject Devices** are in the possession of United States Customs and Border Protection., and are further described in Attachments A-1 and A-2 (incorporated herein by reference).

4.     I seek authority to search the **Subject Devices** for evidence of crimes, specifically violations of Title 8, United States Code, Section 1324.

5.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that others or I have learned during the course of this investigation.   In addition, the information contained in this Affidavit is based upon review of various official reports, upon conversations with other Border

---

April 24, 2018 while PATARA, Ramirez, and Lopez were being processed subsequent to their arrests. Since I was not aware of the initial searches conducted on April 24, 2018, none the data obtained pursuant to the search was included in the search warrant affidavit I swore to on May 15, 2018.

[2]     The **Subject Devices** were physically seized from PATARA at the time of his arrest on April 24, 2018 and were inadvertently placed in his personal property.  On or about May 3, 2018, United States Border Patrol found the **Subject Thumb Drive** attached to PATARA's vehicle key ring.  On May 15, 2018, while I was submitting the five cellular telephones to the forensic laboratory for analysis, I was advised that the **Subject Thumb Drive** was found on PATARA's vehicle key ring.  On May 23, 2018, the **Subject Thumb Drive** was seized as evidence.  On May 24, 2018, while returning PATARA's personal property, United States Border Patrol agents found the **Subject Telephone** in PATARA's personal property and it was seized as evidence.

Patrol Agents, and my personal observations and knowledge. I submit this Affidavit to search the **Subject Devices** for and to seize evidence as outlined in Attachments B-1 and B-2.

## EXPERIENCE AND TRAINING

5. I am an Officer with Department of Homeland Security, United States Customs and Border Protection and have been employed since 2008. I am currently assigned to the San Diego Sector Intelligence Unit ("SIU"). SIU is tasked with the responsibility of investigating, arresting, and prosecuting criminal smugglers that utilize the Southern District of California as an operational corridor. These investigations are complex investigations of mid-level criminal smuggling organizations.

6. I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As such, I am empowered to conduct investigations of, and to make arrests for federal offenses.

7. As an Agent with Border Patrol, my primary duties include the investigation of alien smuggling-related violations of Title 8 of the United States Code. In the course of my duties, I investigate and prepare criminal cases for prosecution against persons involved in the inducement of illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States. During my tenure as a Border Patrol Agent, I have (1) worked as a case agent, overseeing alien smuggling-related investigations; (2) surveilled and recorded movements of individuals suspected of smuggling aliens; (3) participated in the execution of search warrants related to alien smuggling

1   investigations; (4) initiated and executed numerous arrests for alien smuggling-
2   related offenses; and, (5) interviewed criminal defendants, witnesses, and
3   informants in furtherance of investigations into the illegal smuggling and
4   trafficking of humans.  Through these duties, I have gained a working knowledge
5   and insight into the operational habits of alien smugglers.

6       8.  Through the course of my training, investigations, and conversations with
7   other law enforcement personnel, I am aware that it is a common practice for alien
8   smugglers to work in concert with other individuals and to do so by utilizing
9   cellular telephones to maintain communications with co-conspirators or illegal
10  aliens in order to further their criminal activities.   The smuggling of aliens
11  generates many types of evidence including, but not limited to, cellular telephone-
12  related evidence such as voicemail messages referring to the arrangements of
13  travel, names, photographs, text messaging (via SMS or other applications), audio
14  files, videos, and telephone numbers of co-conspirators and illegal aliens, as well
15  other electronic devices, such as computers, tablet computer, and computer-storage
16  devices, such as thumb drives.  For example, load drivers transporting aliens within
17  the United States are typically in telephonic contact with co-conspirators and/or
18  illegal aliens immediately prior to and/or following the crossing of the illegal
19  aliens, at which time they receive instructions on how, where, and when to pick-up
20  the illegal aliens for transportation with the United States.   Likewise, co-
21  conspirators involved in alien smuggling activities may use other electronic
22  devices, such as computers, tablet computer, and storage devices, such as thumb
23  drives, to store communications, including emails, payment logs, maps and
24  photographs involved in the coordination and execution of smuggling events, both
25  before and during the smuggling event, as well as coordination of payment after
26  the smuggling event.  Thumb drives are also used as storage devices for programs,
27  applications, operating systems, and as a recovery device to bypass passwords to
28

4

access the data.  Recently, thumb drives are available that allow users to download data from cellular telephones to make available additional storage on the cellular telephone.  Thumb drives are similarly used to free up space on computers and other electronic devices.

9.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling investigations, and the opinions stated below are shared by them.  Based upon my training and experience as a United States Border Patrol Agent, and consultations with law enforcement officers experienced in alien smuggling investigations, I am also aware that:

      a.    Alien smugglers will use storage devices, such as a thumb drive, to store large amounts of data, including email communications; correspondence; documents such as payment logs; photographs of undocumented aliens, pick up and drop off locations and smuggling routes; audio files; videos; appointment dates, and contact information for known associates and co-conspirators; photographs of identification documents and currency.

      b.    Alien smugglers will use cellular telephones because they are mobile and provide instant access to telephone calls, text, web, and voice messages.

      c.    Alien smugglers will use cellular telephones because they are able to monitor the progress of the aliens while the conveyance is in transit.

      d.    Alien smugglers will use cellular telephones to negotiate smuggling fees and to negotiate or direct methods by which the smuggling fees will be paid and accepted.

e.   Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up location and time of the aliens.

f.   Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints.

g.   Alien smugglers will use cellular telephones to communicate with aliens who are crossing into the United States, providing them instructions as to where to go to meet the driver and what to do during a smuggling event, as well as to communicate with aliens while they are being transported within the United States to their final destination.

## FACTS SUPPORTING PROBABLE CAUSE

10.   On April 24, 2018, United States Border Patrol Agents F. Gamez and A. Moreno were performing checkpoint duties at the Interstate 8 (I-8) Border Patrol Checkpoint in Pine Valley, California.

11.   At approximately 12:15 a.m., a Black 2006 Toyota Corolla sedan bearing California license plate 5VXR750 ("vehicle") approached the primary inspection area where Agent Gamez was working.  The vehicle appeared to be occupied by two individuals, the driver (later identified as Mambasse Koulabalo PATARA), and a male front-seat passenger (later identified as German Ramirez-Gonzalez).

12.   When the Toyota came to a stop at the primary inspection area, PATARA immediately displayed a Los Angeles Police Department ("LAPD") identification card and identified himself as an off-duty officer.  Agent Gamez questioned PATARA regarding his citizenship, and PATARA stated that he was a

1  citizen of the United States.   When Agent Gamez directed the same question
2  toward Ramirez, he noticed that Ramirez appeared to be nervous and was avoiding
3  eye contact. Ramirez also stated that he was a United States citizen. Agent Gamez
4  then noticed a third passenger who appeared to be sleeping in the backseat (later
5  identified as Fermin Lopez).   Agent Gamez asked PATARA if he was aware of
6  Lopez's country of citizenship.   PATARA stated that Lopez was a United States
7  citizen and woke Lopez up.   Agent Gamez then asked Lopez if he was a United
8  States citizen.  Lopez said yes but did not appear to understand the question.
9  Agent Gamez then repeated the question in the Spanish language, and Lopez stated
10  that he was a citizen of the United States.  Agent Gamez also asked Lopez if he
11  had any photo identification which could confirm his identity. Lopez stated that he
12  was not in possession of any such identification.  In Agent Gamez's experience,
13  subjects that do not possess photo identification may be attempting to conceal their
14  identity.

15      13.     Agent Gamez redirected his attention to PATARA and asked where
16  they were coming from. PATARA stated that they were coming from the Golden
17  Acorn Casino.  During questioning, PATARA appeared visibly nervous and was
18  shaking.  In Agent Gamez's experience, the Golden Acorn Casino is a well-known
19  staging  area  for  alien  smuggling  activity.     Based  upon  Agent  Gamez's
20  observations, he referred PATARA to the secondary inspection area.

21      14.     In the secondary inspection area, Agent Moreno made contact with
22  PATARA and continued to investigate. PATARA informed Agent Moreno that he
23  was an officer with the LAPD, and that he was in possession of his service-issued
24  firearm.   It appeared to Agent Moreno that PATARA was reaching toward the
25  firearm and Agent Moreno reminded PATARA to keep his hands where he could
26  see them.   Agent Moreno asked PATARA to present his official badge and
27  credentials but PATARA stated that the LAPD did not issue any.   However,

28

PATARA displayed what appeared to be a LAPD identification card. During this time, other agents escorted Ramirez into the processing area and made further attempts to establish his identity.

15.   Agent Moreno instructed PATARA to exit the vehicle so he could perform a pat-down for safety reasons. As PATARA placed his hands on the hood of the vehicle, Agent Moreno spotted a firearm protruding from his waistband. After Agent Moreno secured the firearm, he continued to question PATARA. PATARA stated that Ramirez was a friend and a neighbor who he had known for approximately five years. PATARA also stated that Ramirez routinely did his yard work. Additionally, PATARA stated that he and the other two men had come to San Diego with their wives to visit the Golden Acorn Casino. PATARA gave his consent to search the vehicle and stated that he was the owner.

16.   Agent Moreno then approached Lopez and questioned him as to his relationship with PATARA. Lopez stated that he did not know PATARA. He also stated that he and Ramirez had met PATARA at a casino and had asked him for a ride. Based on his training and experience, Agent Moreno suspected that Lopez and Ramirez may be illegal aliens being smuggled by PATARA. Agent Moreno also questioned Lopez regarding his citizenship, and Lopez stated that he was a Lawfully Admitted Permanent Resident ("LAPR") of the United States but was not in possession of his official documentation. Agent Moreno suspected that Lopez was lying and told Lopez that falsely claiming United States citizenship is a criminal offense. Lopez admitted to Agent Moreno that he was present in the United States illegally.

17.   In the processing center, Agent Moreno then questioned Ramirez regarding his immigration status. Ramirez stated that he was in the process of obtaining the proper documentation to reside in the United States legally. Agent Moreno told Ramirez that making false statements to a federal agent is a criminal

1    offense.  Ramirez then admitted that he was present in the United States illegally.
2    Ramirez also stated that he had been apprehended by immigration officials in the
3    past.

4         18.    At approximately 1:30 a.m., after record checks confirmed that
5    Ramirez and Lopez were not United States citizens, Agent Moreno placed them
6    under arrest.   Agent Moreno also placed PATARA under arrest for alien
7    smuggling.

8         19.    Agents attempted to conduct a post-*Miranda* interview with
9    PATARA, but he elected not to make any statements in the absence of an attorney.

10        20.    Post-arrest, agents separately interviewed Ramirez and Lopez about
11   the smuggling event.

12        21.    Ramirez stated that approximately six days prior he located his uncle
13   (Lopez) in Mexico.  Ramirez admitted that the two decided to illegally cross the
14   United States/Mexico international border into the United States.  He stated that
15   they did so without the assistance of any smuggling organizer.  Ramirez also stated
16   that, after jumping the border fence, they arrived at a road where an unknown
17   individual agreed to give them a ride to Los Angeles.

18        22.    Ramirez also stated that he has known PATARA for approximately
19   five years and that he done work on PATARA's property.  Ramirez stated that, on
20   April 23, 2018, he and Lopez met with PATARA in Fontana, California, and
21   traveled to San Diego to gamble at some of the local casinos.  They gambled at the
22   Viejas Casino for approximately one hour before deciding to travel to the Golden
23   Acorn Casino.  The three men spent approximately ten or fifteen minutes at the
24   Golden Acorn Casino before heading back toward Los Angeles sometime between
25   8:00 p.m. and 9:00 pm.  Ramirez stated that they never traveled east of the Golden
26   Acorn Casino, drove directly between the casino and the checkpoint, made no
27   stops, and were unaware of the Border Patrol Checkpoint where they were

28

1  arrested.  Ramirez could not provide an explanation for how a 15-to-20-minute
2  drive took approximately three to four hours, as they arrived at the checkpoint at
3  approximately 12:15 a.m.  Agents showed Ramirez a photographic line-up and
4  Ramirez identified a photograph of PATARA as the driver of the vehicle.

5       23.    Agents also interviewed Lopez post-arrest and questioned him
6  regarding the smuggling event.  Lopez stated that on April 22, 2018 he and his
7  nephew (Ramirez) illegally crossed the United States/Mexico international border
8  after walking for a day-and-a-half.  The two men walked to the Golden Acorn
9  Casino.  After Lopez used the bathroom at the casino to wash up, Ramirez told
10 Lopez that he had located an individual that would be willing to give them a ride.
11 Lopez also stated that Ramirez had instructed him to get into the backseat of the
12 car.  Lopez stated that he had fallen asleep prior to encountering Border Patrol
13 agents at the checkpoint.  Lopez was shown a photographic line-up but was unable
14 to identify any of the individuals.

15      24.    Based upon my experience and investigation in this case, I believe
16 that PATARA, as well as other persons, as-yet-unknown, were involved in a
17 criminal scheme to smuggle aliens from Mexico into the United States, and to
18 transport them further into the United States to their final destination.  Based on
19 my experience investigating alien smugglers, I also believe that there is probable
20 cause to believe PATARA used the **Subject Telephone** to coordinate with co-
21 conspirators to bring in unlawful aliens into the United States and to transport them
22 further into the United States.  Additionally, I believe that there is probable cause
23 to believe that PATARA used the **Subject Telephone** to communicate with co-
24 conspirators, as well as Lopez and Ramirez, providing them instructions as to
25 where to go to meet PATARA and what to do during the smuggling event.  I also
26 believe that recent telephone calls made and received, telephone numbers, contact
27 names, electronic mail (e-mail) addresses, appointment dates, text messages, audio

28

10

1  files, video, photographs, GPS location data, and other digital information are
2  stored in the memory of the **Subject Devices**, which may identify other persons
3  involved in the alien smuggling activity.

4      25.    Based upon my experience and training, consultation with other law
5  enforcement officers experienced in alien smuggling investigations, and all the
6  facts and opinions set forth in this affidavit, I believe that information relevant to
7  the alien smuggling activities of PATARA and his co-conspirators, such as
8  telephone numbers, telephone calls made and received, contact names, electronic
9  mail (email) addresses, appointment dates, messages, photographs, audio files,
10 video, GPS location data, documents that contain information such as payment
11 logs, and other digital information are stored in the memory of the **Subject**
12 **Devices** described herein.

13 **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

14     26.    With the approval of the Court in signing this warrant, agents
15 executing this search warrant will employ the following procedures regarding
16 computers and other electronic storage devices, including electronic storage media,
17 that may contain data subject to seizure pursuant to this warrant:

18 <u>Seizure and Retention of Instrumentalities</u>

19     a.    Based upon the foregoing, there is probable cause to believe that
20 computers and other electronic storage devices encountered during this search may
21 contain contraband and fruits of crime as provided at Rule 41(c)(2) of the Federal
22 Rules of Criminal Procedure, or were used in committing crime as provided at
23 Rule 41(c)(3), and are therefore instrumentalities of the enumerated offenses.
24 Consequently, the computers and any other electronic storage devices are subject
25 to seizure, retention, and possible forfeiture and destruction.  Computers, other
26 electronic storage devices, and electronic media that agents confirm onsite contain
27 contraband, constitute fruits of crime, or have been used to commit crime will not

28

11

1   be returned.  Instead, those electronic storage devices and media will be imaged

2   offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite

3   confirmation may be provided by an owner or user of the computer or storage

4   device or, if feasible, may be obtained by conducting a limited onsite forensic

5   examination to determine if the subject media contains any contraband or

6   otherwise is an instrumentality.  Computers and other electronic storage devices

7   and media that are not confirmed onsite as instrumentalities will be taken offsite

8   for imaging and preliminary analysis in accordance with subparagraph (b) below.

9       b.    The offsite imaging and preliminary analysis of computers and other

10  electronic storage devices and media to confirm their status as instrumentalities

11  will be conducted within forty five (45) days of seizure. Seized items confirmed to

12  be instrumentalities will not be returned and will be further analyzed as provided

13  below.  If the preliminary analysis, by definition an incomplete or partial analysis,

14  does not confirm that a seized item is an instrumentality, the original item will be

15  returned promptly to its owner, absent an extension of time obtained from the

16  owner or from the court. An image of the items will be retained and subjected to a

17  complete forensic analysis, as provided below.

18      c.    Computers and other electronic storage devices and media that are

19  retained as instrumentalities will not be returned to the owner.  The owner will be

20  provided the name and address of a responsible official to whom the owner may

21  apply in writing for return of specific data not otherwise subject to seizure for

22  which the owner has a specific need. The identified official or other representative

23  of the seizing agency will reply in writing. If the owner's request is granted,

24  arrangements will be made for a copy of the requested data to be obtained by the

25  owner.  If the request is denied, the owner will be directed to Rule 41(g) of the

26  Federal Rules of Criminal Procedure.

27  //

28

Identification and Extraction of Relevant Data

d.    A forensic image is an exact physical copy of the hard drive or other electronic storage media. After obtaining a forensic image, the imaged copy will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text

13

1   format.  Documents printed by the computer, even if the document was never

2   saved to the hard drive, are recoverable by forensic programs because the printed

3   document is stored as a graphic image.  Graphic images, unlike text, are not subject

4   to keyword searches.  Similarly, faxes sent to the computer are stored as graphic

5   images and not as text.  In addition, a particular relevant piece of data does not

6   exist in a vacuum. To determine who created, modified, copied, downloaded,

7   transferred, communicated about, deleted, or printed the data requires a search of

8   other events that occurred on the computer in the time periods surrounding activity

9   regarding the relevant data.  Information about which user had logged in, whether

10  users share passwords, whether the computer was connected to other computers or

11  networks, and whether the user accessed or used other programs or services in the

12  time period surrounding events with the relevant data can help determine who was

13  sitting at the keyboard.

14        f.      It is often difficult or impossible to determine the identity of the

15  person using the computer when incriminating data has been created, modified,

16  accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing

17  the incriminating data. Computers generate substantial information about data and

18  about users that generally is not visible to users.   Computer-generated data,

19  including registry information, computer logs, user profiles and passwords, web-

20  browsing history, cookies and application and operating system metadata, often

21  provides evidence of who was using the computer at a relevant time.  In addition,

22  evidence such as electronic mail, chat sessions, photographs and videos, calendars

23  and address books stored on the computer may identify the user at a particular,

24  relevant time.  The manner in which the user has structured and named files, run or

25  accessed particular applications, and created or accessed other, non-incriminating

26  files or documents, may serve to identify a particular user.  For example, if an

27  incriminating document is found on the computer but attribution is an issue, other

28

1    documents or files created around that same time may provide circumstantial

2    evidence of the identity of the user that created the incriminating document.

3         g.    Analyzing data has become increasingly time-consuming as the

4    volume of data stored on a typical computer system and available storage devices

5    has become mind-boggling.  For example, a single megabyte of storage space is

6    roughly equivalent to 500 double-spaced pages of text.  A single gigabyte of

7    storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced

8    pages of text.  Computer hard drives are now being sold for personal computers

9    capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may

10   be stored in a variety of formats or encrypted (several new commercially available

11   operating systems provide for automatic encryption of data upon shutdown of the

12   computer).  The sheer volume of data also has extended the time that it takes to

13   analyze data.  Running keyword searches takes longer and results in more hits that

14   must be individually examined for relevance.  And, once reviewed, relevant data

15   leads to new keywords and new avenues for identifying data subject to seizure

16   pursuant to the warrant.

17        h.    Based on the foregoing, identifying and extracting data subject to

18   seizure pursuant to this warrant may require a range of data analysis techniques,

19   including the use of hashing tools to identify evidence subject to seizure pursuant

20   to this warrant, and to exclude certain data from analysis, such as known operating

21   system and application files.  The identification and extraction process may take

22   weeks or months. The personnel conducting the identification and extraction of

23   data will complete the analysis within one-hundred twenty (120) days from the

24   date of seizure pursuant to this warrant, absent further application to this court.

25        i.    All forensic analysis of the imaged data will employ search protocols

26   directed exclusively to the identification and extraction of data within the scope of

27   this warrant.

28

Genuine Risks of Destruction of Data

j.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

Prior Attempts to Obtain Data

k.     The United States has not previously attempted to obtain this data.

**METHODOLOGY FOR CELLULAR TELEPHONE**

27.     It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books, and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing.   An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.   For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.   Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.   For devices that are not subject to forensic

16

1  data acquisition or that have potentially relevant data stored that is not subject to

2  such acquisition, the examiner must inspect the device manually and record the

3  process and the results using digital photography.  This process is time and labor

4  intensive and may take weeks or longer.

5      28.    Following the issuance of this warrant, I will collect the **Subject**

6  **Devices** and subject them to analysis.  All forensic analysis of the data contained

7  within the **Subject Devices** and their memory cards will employ search protocols

8  directed exclusively to the identification and extraction of data within the scope of

9  this warrant.

10     29.    Based on the foregoing, identifying and extracting data subject to

11  seizure pursuant to this warrant may require a range of data analysis techniques,

12  including manual review, and, consequently, may take weeks or months.  The

13  personnel conducting the identification and extraction of data will complete the

14  analysis within ninety (90) days absent further application to this Court.

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

## **CONCLUSION**

1

2      30.    Based on all of the facts and circumstances described above, I believe

3 that probable exists to conclude that PATARA, Lopez, and Ramirez used the

4 **Subject Devices** to facilitate the offense of alien smuggling. The **Subject Devices**

5 were likely used to facilitate the offense by transmitting and storing data,

6 specifically that described in Attachments B-1 and B-2, which constitutes

7 evidence, fruits, and instrumentalities of violations of Title 8, United States Code,

8 Section 1324.   I also believe that probable cause exists to believe that evidence,

9 fruits, and instrumentalities of illegal activity committed by PATARA continues to

10 exist on the **Subject Devices**. Therefore, I respectfully request that the Court issue

11 this warrant.

12      I swear the foregoing is true and correct to the best of my knowledge and

13 belief.

14

15      MATTHEW SMITH

16      United States Border Patrol Agent

17

18 SUBSCRIBED AND SWORN TO ME BEFORE THIS 5th DAY OF June, 2018.

19

20

21

22      HONORABLE KAREN S. CRAWFORD

23      United States Magistrate Judge

24

25

26

27

28

## ATTACHMENT A-2:

### *DESCRIPTION OF DEVICE TO BE SEARCHED*

One Verbatim Thumb Drive, S/N: NG04G4315006262DML
("Subject Thumb Drive");

The device was seized on or about April 24, 2018 from Mambasse Koulabalo PATARA, in the Southern District of California, and is currently in the custody of U.S. Border Patrol, located at 3752 Beyer Blvd., Bldg. 24, San Diego, CA 92173.

## **ATTACHMENT B-2**

## **ITEMS TO BE SEIZED**

The items to be seized are evidence of transportation of illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). These crimes relate to the smuggling of aliens (namely aliens Fermin LOPEZ and German RAMIREZ-Gonzalez) in and around the County of San Diego, California by Mambasse Koulabalo PATARA, and other known and unknown co-conspirators for the period from on or about April 16, 2018 through April 24, 2018, whereby the criminal conduct involves the aliens being transported further into United States once the aliens entered the United States from the Republic of Mexico. The evidence to be seized is limited to the time period of April 16, 2018 to April 24, 2018 and is limited to electronic communications, correspondence, photographs, audio files, videos, or location data stored documents pertaining to the following:

  a.  tending to indicate that the user of the electronic device benefits, financially or by receiving anything of value, from the alien smuggling;

  b.  tending to show telephone numbers and direct connect numbers or identities assigned to the device, including usernames and passwords and electronic mail addresses;

  c.  tending to show call and direct connect history information, including Internet Protocol addresses accessed by the device or accessing the device;

  d.  tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, telephone numbers that may contain electronic evidence tending to show efforts to recruit, harbor, transport, provide, obtain or maintain a person involved in alien smuggling; or tending to indicate efforts to recruit, harbor, transport, provide, obtain or smuggle a person; or tending to indicate that the user of the electronic device benefits, financially or by receiving anything of value, from alien smuggling;

e.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling;

f.   tending to identity the user of, or persons with control over or access to, the electronic device;

g.   Stored photographs, videos and text messages tending to show planning of and involvement in alien smuggling;

h.   Stored electronic mail, including attachments, and voice messages and other recordings tending to show planning of and involvement in alien smuggling;

i.   Web-browsing history and any stored web pages tending to show planning of and involvement in alien smuggling;

j.   Stored documents and other files tending to show planning of and involvement in alien smuggling, and planning and involvement in the payment of alien smuggling fees;

k.   Stored geo-location information tending to show planning of and involvement in alien smuggling; and,

l.   Data stored in any application tending to show planning of, and involvement in, and paying or receiving payments for alien smuggling.

Authorization is sought to search for and seize evidence of the crimes described above in paragraphs 1 and 2.  Authorization to search includes the premise and property as described more fully in **Attachment A-2.**

# APPENDIX A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Southern California

FILED

MAY 1 5 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   18MJ2492 |
| One Black Samsung Cellular Telephone, (IMEI) 358503087246949 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
As further described in Attachment A-1.

located in the        San Diego,        District of        Southern California        , there is now concealed *(identify the*
California

*person or describe the property to be seized):*
As set forth in Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 8 U.S.C. § 1324 | Transporting Certain Aliens |

The application is based on these facts:

The Affidavit of United States Border Patrol Agent Matthew Smith is incorporated herein by reference.

☒ Continued on the attached sheet.
☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Matthew Smith, United States Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:        5/15/2018

*Judge's signature*

City and state:   San Diego, California        Honorable Karen S. Crawford U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1:

### *DESCRIPTION OF DEVICE TO BE SEARCHED*

One Black Samsung Cellular Telephone, IMEI 358503087246949 ("Subject Telephone #1);

The device was seized on or about April 24, 2018 from Mambasse Koulabalo PATARA, in the Southern District of California, and is currently in the custody of U.S. Border Patrol, located at 3752 Beyer Blvd., Bldg. 24, San Diego, CA 92173.

## ATTACHMENT B-1

## ITEMS TO BE SEIZED

The items to be seized are evidence of transportation of illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). These crimes relate to the smuggling of aliens (namely aliens Fermin LOPEZ and German RAMIREZ-Gonzalez) in and around the County of San Diego, California by Mambasse Koulabalo PATARA, and other known and unknown co-conspirators for the period from on or about April 16, 2018 through April 24, 2018, whereby the criminal conduct involves the aliens being transported further into United States once the aliens entered the United States from the Republic of Mexico. The evidence to be seized is limited to the time period of April 16, 2018 to April 24, 2018 and is limited to the following:

1.  Cellular telephones, SIM cards, and cellular telephone records that may be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, text messages and voice messages relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens;

2.  As it relates to the cellular telephone and any storage devices, such as SIM cards or flash memory devices attached to, located within, or seized with the device, will be analyzed and the following data will be seized only to the extent that it contains or depicts evidence the criminal conduct mentioned above, including evidence reflecting use, dominion and control of the device:

    a.  tending to indicate that the user of the telephone benefits, financially or by receiving anything of value, from the alien smuggling;

    b.  tending to show telephone numbers and direct connect numbers or identities assigned to the device, including usernames and passwords and electronic mail addresses;

    c.  tending to show call and direct connect history information, including Internet Protocol addresses accessed by the device or accessing the device;

d.    tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, telephone numbers that may contain electronic evidence tending to show efforts to recruit, harbor, transport, provide, obtain or maintain a person involved in alien smuggling; or tending to indicate efforts to recruit, harbor, transport, provide, obtain or smuggle a person; or tending to indicate that the user of the telephone benefits, financially or by receiving anything of value, from alien smuggling;

e.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling;

f.    tending to identity the user of, or persons with control over or access to, the telephone;

g.    Stored photographs, videos and text messages tending to show planning of and involvement in alien smuggling;

h.    Stored electronic mail, including attachments, and voice messages and other recordings tending to show planning of and involvement in alien smuggling;

i.    Web-browsing history and any stored web pages tending to show planning of and involvement in alien smuggling;

j.    Stored documents and other files tending to show planning of and involvement in alien smuggling;

k.    Stored geo-location information tending to show planning of and involvement in alien smuggling; and,

l.    Data stored in any application tending to show planning of and involvement in alien smuggling.

Authorization is sought to search for and seize evidence of the crimes described above in paragraphs 1 and 2. Authorization to search includes the premise and property as described more fully in **Attachment A-1**.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No.: |
| One Black Samsung Cellular Telephone, IMEI 358503087246949 | **AFFIDAVIT OF UNITED STATES BORDER PATROL AGENT MATTHEW SMITH IN SUPPORT OF SEARCH WARRANT** |
| One Lanix Cellular Telephone, IMEI 352156071628972 | |
| One X325 Wind II Cellular Telephone, IMEI 353911085280346 | |
| One Black LG Cellular Telephone, IMEI 355197060656787 | |
| One Black Samsung Cellular Telephone, Model SM-57279 | |

## AFFIDAVIT

I, MATTHEW SMITH, United States Border Patrol Agent - Intelligence ("USBPA-I"), having been duly sworn, depose and state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for one black Samsung cellular telephone, IMEI 358503087246949 seized from defendant Mambasse Koulabalo PATARA (**Subject Telephone #1**); one Lanix cellular telephone, IMEI 352156071628972 (**Subject Telephone #2**); one X325 Wind II cellular telephone, IMEI 353911085280346 (**Subject Telephone #3**) seized from material witness Fermin LOPEZ; one black LG cellular telephone, IMEI 355197060656787 (**Subject Telephone #4**); and one black Samsung cellular telephone, model SM-J727P (**Subject Telephone #5**) seized from material witness German RAMIREZ-Gonzalez.   **Subject Telephones 1** through **5** (collectively "**Subject Telephones**") were seized on or about April 24, 2018, at the time of PATARA's, Ramirez's and Lopez's arrests in connection with a smuggling event

1

1    within the Southern District of California in which defendant PATARA was

2    arrested for transportation of unlawful aliens, specifically LOPEZ and RAMIREZ,

3    in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  The **Subject Telephones** are in the

4    possession of United States Customs and Border Protection., and are further

5    described in Attachments A-1, A-2, A-3, A-4, and A-5 (incorporated herein by

6    reference).

7        2.    I seek authority to search the **Subject Telephones** for evidence of

8    crimes, specifically violations of Title 8, United States Code, Section 1324.

9        3.    Because this affidavit is being submitted for the limited purpose of

10   establishing probable cause in support of the application for a search warrant, it

11   does not set forth every fact that others or I have learned during the course of this

12   investigation.   In addition, the information contained in this Affidavit is based

13   upon review of various official reports, upon conversations with other Border

14   Patrol Agents, and my personal observations and knowledge.   I submit this

15   Affidavit to search the **Subject Telephones** for and to seize evidence as outlined in

16   Attachments B-1, B-2, B-3, B-4, and B-5.

17                        **EXPERIENCE AND TRAINING**

18       4.    I am an Officer with Department of Homeland Security, United States

19   Customs and Border Protection and have been employed since 2008.   I am

20   currently assigned to the San Diego Sector Intelligence Unit ("SIU").   SIU is

21   tasked with the responsibility of investigating, arresting, and prosecuting criminal

22   smugglers that utilize the Southern District of California as an operational corridor.

23   These investigations are complex investigations of mid-level criminal smuggling

24   organizations.

25       5.    I am a Federal Law Enforcement Officer within the meaning of Rule

26   41(b) of the Federal Rules of Criminal Procedure, that is, a government agent

27   engaged in the enforcement of the criminal laws of the United States, and thereby

28

1  authorized to request issuance of federal search and seizure warrants.  As such, I
2  am empowered to conduct investigations of, and to make arrests for federal
3  offenses.

4      6.    As an Agent with Border Patrol, my primary duties include the
5  investigation of alien smuggling-related violations of Title 8 of the United States
6  Code.  In the course of my duties, I investigate and prepare criminal cases for
7  prosecution against persons involved in the inducement of illegal entry of
8  undocumented aliens into the United States; the smuggling of undocumented aliens
9  into the United States; and the transportation and harboring of undocumented
10 aliens within the United States.  During my tenure as a Border Patrol Agent, I have
11 (1) worked as a case agent, overseeing alien smuggling-related investigations; (2)
12 surveilled and recorded movements of individuals suspected of smuggling aliens;
13 (3) participated in the execution of search warrants related to alien smuggling
14 investigations; (4) initiated and executed numerous arrests for alien smuggling-
15 related offenses; and, (5) interviewed criminal defendants, witnesses, and
16 informants in furtherance of investigations into the illegal smuggling and
17 trafficking of humans.  Through these duties, I have gained a working knowledge
18 and insight into the operational habits of alien smugglers.

19     7. Through the course of my training, investigations, and conversations with
20 other law enforcement personnel, I am aware that it is a common practice for alien
21 smugglers to work in concert with other individuals and to do so by utilizing
22 cellular telephones to maintain communications with co-conspirators or illegal
23 aliens in order to further their criminal activities.   The smuggling of aliens
24 generates many types of evidence including, but not limited to, cellular telephone-
25 related evidence such as voicemail messages referring to the arrangements of
26 travel, names, photographs, text messaging (via SMS or other applications), and
27 telephone numbers of co-conspirators and illegal aliens.  For example, load drivers
28

3

1   transporting aliens within the United States are typically in telephonic contact with
2   co-conspirators and/or illegal aliens immediately prior to and/or following the
3   crossing of the illegal aliens, at which time they receive instructions on how,
4   where, and when to pick-up the illegal aliens for transportation with the United
5   States.

6       8.      In preparing this affidavit, I have conferred with other agents and law
7   enforcement personnel who are experienced in the area of alien smuggling
8   investigations, and the opinions stated below are shared by them.  Based upon my
9   training and experience as a United States Border Patrol Agent, and consultations
10  with law enforcement officers experienced in alien smuggling investigations, I am
11  also aware that:

12          a.    Alien smugglers will use cellular telephones because they are
13                mobile and provide instant access to telephone calls, text, web,
14                and voice messages.

15          b.    Alien smugglers will use cellular telephones because they are
16                able to monitor the progress of the aliens while the conveyance
17                is in transit.

18          c.    Alien smugglers will use cellular telephones to negotiate
19                smuggling fees and to negotiate or direct methods by which the
20                smuggling fees will be paid and accepted.

21          d.    Alien smugglers will use cellular telephones to direct drivers to
22                synchronize an exact drop off and/or pick up location and time
23                of the aliens.

24          e.    Alien smugglers will use cellular telephones to notify or warn
25                their accomplices of law enforcement activity to include the
26                presence and posture of marked and unmarked units, as well as
27                the operational status of checkpoints.

28

4

1      f.    Alien smugglers will use cellular telephones to communicate

2           with aliens who are crossing into the United States, providing

3           them instructions as to where to go to meet the driver and what

4           to do during a smuggling event, as well as to communicate with

5           aliens while they are being transported within the United States

6           to their final destination.

## FACTS SUPPORTING PROBABLE CAUSE

9.    On April 24, 2018, United States Border Patrol Agents F. Gamez and A. Moreno were performing checkpoint duties at the Interstate 8 (I-8) Border Patrol Checkpoint in Pine Valley, California.

10.    At approximately 12:15 a.m., a Black 2006 Toyota Corolla sedan bearing California license plate 5VXR750 ("vehicle") approached the primary inspection area where Agent Gamez was working.  The vehicle appeared to be occupied by two individuals, the driver (later identified as Mambasse Koulabalo PATARA), and a male front-seat passenger (later identified as German Ramirez-Gonzalez).

11.    When the Toyota came to a stop at the primary inspection area, PATARA immediately displayed a Los Angeles Police Department ("LAPD") identification card and identified himself as an off-duty officer.  Agent Gamez questioned PATARA regarding his citizenship, and PATARA stated that he was a citizen of the United States.  When Agent Gamez directed the same question toward Ramirez, he noticed that Ramirez appeared to be nervous and was avoiding eye contact. Ramirez also stated that he was a United States citizen. Agent Gamez then noticed a third passenger who appeared to be sleeping in the backseat (later identified as Fermin Lopez).  Agent Gamez asked PATARA if he was aware of Lopez's country of citizenship.  PATARA stated that Lopez was a United States citizen and woke Lopez up.  Agent Gamez then asked Lopez if he was a United

5

1   States citizen.  Lopez said yes but did not appear to understand the question.
2   Agent Gamez then repeated the question in the Spanish language, and Lopez stated
3   that he was a citizen of the United States.  Agent Gamez also asked Lopez if he
4   had any photo identification which could confirm his identity.  Lopez stated that he
5   was not in possession of any such identification.  In Agent Gamez's experience,
6   subjects that do not possess photo identification may be attempting to conceal their
7   identity.

8        12.   Agent Gamez redirected his attention to PATARA and asked where
9   they were coming from.  PATARA stated that they were coming from the Golden
10  Acorn Casino.  During questioning, PATARA appeared visibly nervous and was
11  shaking.  In Agent Gamez's experience, the Golden Acorn Casino is a well-known
12  staging area for alien smuggling activity.   Based upon Agent Gamez's
13  observations, he referred PATARA to the secondary inspection area.

14       13.   In the secondary inspection area, Agent Moreno made contact with
15  PATARA and continued to investigate.  PATARA informed Agent Moreno that he
16  was an officer with the LAPD, and that he was in possession of his service-issued
17  firearm.  It appeared to Agent Moreno that PATARA was reaching toward the
18  firearm and Agent Moreno reminded PATARA to keep his hands where he could
19  see them.  Agent Moreno asked PATARA to present his official badge and
20  credentials but PATARA stated that the LAPD did not issue any.  However,
21  PATARA displayed what appeared to be a LAPD identification card.  During this
22  time, other agents escorted Ramirez into the processing area and made further
23  attempts to establish his identity.

24       14.   Agent Moreno instructed PATARA to exit the vehicle so he could
25  perform a pat-down for safety reasons.  As PATARA placed his hands on the hood
26  of the vehicle, Agent Moreno spotted a firearm protruding from his waistband.
27  After Agent Moreno secured the firearm, he continued to question PATARA.

28

1    PATARA stated that Ramirez was a friend and a neighbor who he had known for
2    approximately five years. PATARA also stated that Ramirez routinely did his yard
3    work. Additionally, PATARA stated that he and the other two men had come to
4    San Diego with their wives to visit the Golden Acorn Casino. PATARA gave his
5    consent to search the vehicle and stated that he was the owner.

6        15.   Agent Moreno then approached Lopez and questioned him as to his
7    relationship with PATARA. Lopez stated that he did not know PATARA. He also
8    stated that he and Ramirez had met PATARA at a casino and had asked him for a
9    ride. Based on his training and experience, Agent Moreno suspected that Lopez
10   and Ramirez may be illegal aliens being smuggled by PATARA. Agent Moreno
11   also questioned Lopez regarding his citizenship, and Lopez stated that he was a
12   Lawfully Admitted Permanent Resident ("LAPR") of the United States but was not
13   in possession of his official documentation. Agent Moreno suspected that Lopez
14   was lying and told Lopez that falsely claiming United States citizenship is a
15   criminal offense. Lopez admitted to Agent Moreno that he was present in the
16   United States illegally.

17       16.   In the processing center, Agent Moreno then questioned Ramirez
18   regarding his immigration status. Ramirez stated that he was in the process of
19   obtaining the proper documentation to reside in the United States legally. Agent
20   Moreno told Ramirez that making false statements to a federal agent is a criminal
21   offense. Ramirez then admitted that he was present in the United States illegally.
22   Ramirez also stated that he had been apprehended by immigration officials in the
23   past.

24       17.   At approximately 1:30 a.m., after record checks confirmed that
25   Ramirez and Lopez were not United States citizens, Agent Moreno placed them
26   under arrest. Agent Moreno also placed PATARA under arrest for alien
27   smuggling.

28

18.   Agents attempted to conduct a post-*Miranda* interview with PATARA, but he elected not to make any statements in the absence of an attorney.

19.   Post-arrest, agents separately interviewed Ramirez and Lopez about the smuggling event.

20.   Ramirez stated that approximately six days prior he located his uncle (Lopez) in Mexico. Ramirez admitted that the two decided to illegally cross the United States/Mexico international border into the United States. He stated that they did so without the assistance of any smuggling organizer. Ramirez also stated that, after jumping the border fence, they arrived at a road where an unknown individual agreed to give them a ride to Los Angeles.

21.   Ramirez also stated that he has known PATARA for approximately five years and that he done work on PATARA's property. Ramirez stated that, on April 23, 2018, he and Lopez met with PATARA in Fontana, California, and traveled to San Diego to gamble at some of the local casinos. They gambled at the Viejas Casino for approximately one hour before deciding to travel to the Golden Acorn Casino. The three men spent approximately ten or fifteen minutes at the Golden Acorn Casino before heading back toward Los Angeles sometime between 8:00 p.m. and 9:00 pm. Ramirez stated that they never traveled east of the Golden Acorn Casino, drove directly between the casino and the checkpoint, made no stops, and were unaware of the Border Patrol Checkpoint where they were arrested. Ramirez could not provide an explanation for how a 15-to-20-minute drive took approximately three to four hours, as they arrived at the checkpoint at approximately 12:15 a.m. Agents showed Ramirez a photographic line-up and Ramirez identified a photograph of PATARA as the driver of the vehicle.

22.   Agents also interviewed Lopez post-arrest and questioned him regarding the smuggling event. Lopez stated that on April 22, 2018 he and his nephew (Ramirez) illegally crossed the United States/Mexico international border

8

1   after walking for a day-and-a-half. The two men walked to the Golden Acorn
2   Casino. After Lopez used the bathroom at the casino to wash up, Ramirez told
3   Lopez that he had located an individual that would be willing to give them a ride.
4   Lopez also stated that Ramirez had instructed him to get into the backseat of the
5   car. Lopez stated that he had fallen asleep prior to encountering Border Patrol
6   agents at the checkpoint. Lopez was shown a photographic line-up but was unable
7   to identify any of the individuals.

8       23.   Based upon my experience and investigation in this case, I believe
9   that PATARA, as well as other persons, as-yet-unknown, were involved in a
10   criminal scheme to smuggle aliens from Mexico into the United States, and to
11   transport them further into the United States to their final destination. Based on
12   my experience investigating alien smugglers, I also believe that there is probable
13   cause to believe PATARA used **Subject Telephone #1** to coordinate with co-
14   conspirators to bring in unlawful aliens into the United States and to transport them
15   further into the United States. Additionally, I believe that there is probable cause
16   to believe that PATARA used **Subject Telephone #1** to communicate with co-
17   conspirators, as well as Lopez and Ramirez, providing them instructions as to
18   where to go to meet PATARA and what to do during the smuggling event. I also
19   believe that recent telephone calls made and received, telephone numbers, contact
20   names, electronic mail (e-mail) addresses, appointment dates, text messages,
21   pictures, GPS location data, and other digital information are stored in the memory
22   of **Subject Telephone #1**, which may identify other persons involved in the alien
23   smuggling activity.

24       24.   It is also my belief that there is probable cause to believe that Lopez
25   used **Subject Telephones #2** and **#3**, and that Ramirez used **Subject Telephones**
26   **#4** and **#5** to receive instructions from PATARA, as well as other persons, as-yet-
27   unknown, who were involved in the alien smuggling enterprise. Additionally, I

28

1   believe there is probable cause to believe that Lopez and Ramirez used the cellular
2   telephones to coordinate the smuggling arrangements.  I also believe that recent
3   telephone calls made and received, telephone numbers, contact names, electronic
4   mail (e-mail) addresses, appointment dates, text messages, pictures, GPS location
5   data, and other digital information are stored in the memory of the **Subject**
6   **Telephones**, which may identify other persons involved in the alien smuggling
7   activities.

8       25.    Based upon my experience and training, consultation with other law
9   enforcement officers experienced in alien smuggling investigations, and all the
10  facts and opinions set forth in this affidavit, I believe that information relevant to
11  the alien smuggling activities of PATARA and his co-conspirators, such as
12  telephone numbers, telephone calls made and received, contact names, electronic
13  mail (email) addresses, appointment dates, messages, pictures, GPS location data,
14  and other digital information are stored in the memory of the **Subject Telephones**
15  described herein.

16  **METHODOLOGY**

17      26.    It is not possible to determine merely by knowing the cellular
18  telephones' make, model and serial number, the nature and types of services to
19  which the device is subscribed and the nature of the data stored on the device.
20  Cellular devices today can be simple cellular telephones and text message devices,
21  can include cameras, can serve as personal digital assistants and have functions
22  such as calendars and full address books, and can be mini-computers allowing for
23  electronic mail services, web services, and rudimentary word processing.  An
24  increasing number of cellular service providers now allow for their subscribers to
25  access their device over the internet and remotely destroy all of the data contained
26  on the device.  For that reason, the device may only be powered in a secure
27  environment or, if possible, started in "flight mode," which disables access to the

28

1   network.  Unlike typical computers, many cellular telephones do not have hard

2   drives or hard drive equivalents and, instead, store information in volatile memory

3   within the device or in memory cards inserted into the device.  Current technology

4   provides some solutions for acquiring some of the data stored in some cellular

5   telephone models using forensic hardware and software.  Even if some of the

6   stored information on the device may be acquired forensically, not all of the data

7   subject to seizure may be so acquired.  For devices that are not subject to forensic

8   data acquisition or that have potentially relevant data stored that is not subject to

9   such acquisition, the examiner must inspect the device manually and record the

10  process and the results using digital photography.  This process is time and labor

11  intensive and may take weeks or longer.

12       27.    Following the issuance of this warrant, I will collect the **Subject**

13  **Telephones** and subject them to analysis.  All forensic analysis of the data

14  contained within the **Subject Telephones** and their memory cards will employ

15  search protocols directed exclusively to the identification and extraction of data

16  within the scope of this warrant.

17       28.    Based on the foregoing, identifying and extracting data subject to

18  seizure pursuant to this warrant may require a range of data analysis techniques,

19  including manual review, and, consequently, may take weeks or months.  The

20  personnel conducting the identification and extraction of data will complete the

21  analysis within ninety (90) days absent further application to this Court.

22                         **CONCLUSION**

23       29.    Based on all of the facts and circumstances described above, I believe

24  that probable exists to conclude that PATARA, Lopez, and Ramirez used the

25  **Subject Telephones** to facilitate the offense of alien smuggling.  The **Subject**

26  **Telephones** were likely used to facilitate the offense by transmitting and storing

27  data, specifically that described in Attachments B-1, B-2, B-3, B-4, and B-5,

28

1   which constitutes evidence, fruits, and instrumentalities of violations of Title 8,

2   United States Code, Section 1324.   I also believe that probable cause exists to

3   believe that evidence, fruits, and instrumentalities of illegal activity committed by

4   PATARA continues to exist on the **Subject Telephones**.  Therefore, I respectfully

5   request that the Court issue this warrant.

6        I swear the foregoing is true and correct to the best of my knowledge and

7   belief.

8

9   _____

10   MATTHEW SMITH
    United States Border Patrol Agent

11

12   SUBSCRIBED AND SWORN TO ME BEFORE THIS 15th DAY OF May, 2018.

13

14

15   _____

16   HONORABLE KAREN S. CRAWFORD
    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A-1:

### *DESCRIPTION OF DEVICE TO BE SEARCHED*

One Black Samsung Cellular Telephone, IMEI 358503087246949 ("Subject Telephone #1);

The device was seized on or about April 24, 2018 from Mambasse Koulabalo PATARA, in the Southern District of California, and is currently in the custody of U.S. Border Patrol, located at 3752 Beyer Blvd., Bldg. 24, San Diego, CA 92173.

## ATTACHMENT B-1

## ITEMS TO BE SEIZED

The items to be seized are evidence of transportation of illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). These crimes relate to the smuggling of aliens (namely aliens Fermin LOPEZ and German RAMIREZ-Gonzalez) in and around the County of San Diego, California by Mambasse Koulabalo PATARA, and other known and unknown co-conspirators for the period from on or about April 16, 2018 through April 24, 2018, whereby the criminal conduct involves the aliens being transported further into United States once the aliens entered the United States from the Republic of Mexico. The evidence to be seized is limited to the time period of April 16, 2018 to April 24, 2018 and is limited to the following:

1.  Cellular telephones, SIM cards, and cellular telephone records that may be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, text messages and voice messages relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens;

2.  As it relates to the cellular telephone and any storage devices, such as SIM cards or flash memory devices attached to, located within, or seized with the device, will be analyzed and the following data will be seized only to the extent that it contains or depicts evidence the criminal conduct mentioned above, including evidence reflecting use, dominion and control of the device:

    a.  tending to indicate that the user of the telephone benefits, financially or by receiving anything of value, from the alien smuggling;

    b.  tending to show telephone numbers and direct connect numbers or identities assigned to the device, including usernames and passwords and electronic mail addresses;

    c.  tending to show call and direct connect history information, including Internet Protocol addresses accessed by the device or accessing the device;

d.   tending to identify other facilities, storage devices, or services-such as email addresses, IP addresses, telephone numbers that may contain electronic evidence tending to show efforts to recruit, harbor, transport, provide, obtain or maintain a person involved in alien smuggling; or tending to indicate efforts to recruit, harbor, transport, provide, obtain or smuggle a person; or tending to indicate that the user of the telephone benefits, financially or by receiving anything of value, from alien smuggling;

e.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling;

f.   tending to identity the user of, or persons with control over or access to, the telephone;

g.   Stored photographs, videos and text messages tending to show planning of and involvement in alien smuggling;

h.   Stored electronic mail, including attachments, and voice messages and other recordings tending to show planning of and involvement in alien smuggling;

i.   Web-browsing history and any stored web pages tending to show planning of and involvement in alien smuggling;

j.   Stored documents and other files tending to show planning of and involvement in alien smuggling;

k.   Stored geo-location information tending to show planning of and involvement in alien smuggling; and,

l.   Data stored in any application tending to show planning of and involvement in alien smuggling.

Authorization is sought to search for and seize evidence of the crimes described above in paragraphs 1 and 2. Authorization to search includes the premise and property as described more fully in **Attachment A-1**.